# In the United States Court of Federal Claims

No. 07-374 C

(Filed: May 29, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| AMERICAN CONTRACTORS | * | |
| INDEMNITY COMPANY, | * | |
| | * | Small Business Administration; Surety |
| Plaintiff, | * | Bond; 13 C.F.R. § 115.19; Prior Approval |
| | * | Surety; Sham Affidavit; Summary |
| v. | * | Judgment |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DeWitte Thompson, Johns Creek, GA, for plaintiff.

Michael D. Austin, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court are the parties' cross-motions for summary judgment on the issue of whether, in the context of Small Business Administration ("SBA") regulations, plaintiff, a prior approval surety that is required to obtain prior written approval from the SBA before it agrees or acquiesces to increasing a bond amount by twenty-five percent or $50,000, agreed or acquiesced to a $240,000 increase of the bond it had provided to a small business before the SBA approved the increase. The court finds that plaintiff, American Contractors Indemnity Company ("ACIC"), agreed to an increase before it received SBA approval on June 2, 2004.

## I. FACTUAL BACKGROUND

### A. The Original Bond

ACIC is in the business of issuing performance and payment contract bonds as a surety for the performance of construction contracts.[1] Compl. ¶ 1. ACIC employs different methods to

---

[1] The facts are derived from the complaint ("Compl.") and attached exhibits ("Compl., Ex."), plaintiff's motion for summary judgment ("Mot.") and attached exhibits ("Mot., Ex."), defendant's cross-motion ("Cross-Mot.") and attached appendix ("App."), and plaintiff's response to defendant's cross-motion ("Resp.") and attached exhibits ("Resp., Ex."). The facts are not disputed unless stated otherwise.

decrease its risk upon a principal's default, including: 1) requiring an indemnity agreement from the principal, 2) requiring collateral from the principal, 3) using a funds administrator to control distribution of the contract proceeds, 4) utilizing a state surety guarantee program, and 5) using the SBA's surety guarantee program. App. 70. Depending on the circumstances of the individual or company to be bonded, ACIC may use any or all of the above methods to minimize its risk upon any bond it issues. Id.

In 2002, DiGiovanni Insulation and Refractory, Inc. ("DiGiovanni"), the principal contractor hired to perform alterations and construct additions to a two-story building in New Orleans, Louisiana ("the project"), applied to ACIC for bonds to be issued in connection with the project. Compl. ¶ 9. Because DiGiovanni could not otherwise qualify for the issuance of bonds, DiGiovanni was required to apply and qualify for participation in the SBA Bond Guarantee program, which DiGiovanni did.[2] Mot. 3. DiGiovanni dealt with ACIC's branch office in New Orleans, and in particular, with ACIC's branch manager, Macharl S. Zwart. Id. at 2-3; Cross-Mot. 7. Sometime before August 30, 2002, Mr. Zwart contacted the SBA's regional office in Atlanta, Georgia to inquire about entering into a surety bond guarantee on behalf of DiGiovanni. Cross-Mot. 7. On August 30, 2002, Lillian Martin, a business development specialist with the SBA, wrote to Mr. Zwart, stating in part, "Marcharl, the above named contractor contract amount is above your underwriting authority. We can't process this account due to the limit on your underwriting authority, unless you have a co-surety for the additional amount." App. 1. Daniel Aguilar, who at the time was a senior underwriter for ACIC located in ACIC's home office in Los Angeles, California and who is now the vice president of underwriting for ACIC, described the relationship between a field agent such as Mr. Zwart and the home office underwriting department. Id. at 66-69, 80-81. Generally, ACIC limited the authority of a field agent to enter into a surety bond agreement to those bonds under a million dollars. Id. at 67. Approvals for bonds over that amount had to have home office approval. Id. at 66. At his deposition, Mr. Zwart thought that his authority to enter into bonds without home office approval was limited to bonds under $100,000 but could not be sure. Id. at 83-84.

On September 3, 2002, Mr. Zwart sent a fax transmission to Mr. Aguilar, seeking home office support for the DiGiovanni surety bonds. Id. at 2. In his transmission, Mr. Zwart explained: "I have the paperwork to place in the SBA but we need to have a co surety due to our T-Listing being 1.8 M[,] the job is 1.95. I can phase it but I wanted to run it by you on how to handle." Id. On September 9, 2002, Mr. Aguilar gave home office approval for Mr. Zwart to enter into the surety bond agreement with DiGiovanni, subject to certain conditions. Id. at 4.

On September 13, 2002, Mr. DiGiovanni signed an application for Surety Bond Guarantee Assistance (SBA Form 994). Id. at 7. The second page of the two-page document,

_____

[2] In addition, DiGiovanni provided to ACIC a similar reimbursement agreement through a Louisiana state program, the Louisiana Bond Assistance Program, which guaranteed up to $200,000 in losses that might be incurred by ACIC. Compl. ¶ 10; Mot. 3. DiGiovanni, as a principal obligor and corporate indemnitor, along with Janet DiGiovanni and Emile DiGiovanni as individual indemnitors, also executed and delivered to ACIC a General Indemnity Agreement as partial consideration for issuing bonds for the project. Compl. ¶ 10; see also Mot., Ex. 2 (containing the general indemnity agreement signed by the parties).

2

titled "Surety Bond Guarantee Application Procedures," listed, among other things, the documents that the surety would provide to the applicant for eventual submission to the SBA. Id. at 8. The procedures required that "[i]f the application is for final (performance and/or payment) bonds, it [must] be accompanied by the Contractor Fee. The check is payable to SBA (or Small Business Administration)." Id. Thus, Mr. DiGiovanni wrote a check payable to the "S.B.A. Bond Guarantee Funds" in the amount of $10,692. Id. at 9. There was also an Application Submission Checklist that required the SBA to ensure that the "[a]gent has [a] current [power of attorney] on file with correct limits." Id. at 6. According to another SBA business development specialist, Margaret Johnson, the SBA kept powers of attorney from the various surety companies with whom her office dealt. Id. at 98. Those documents reflected the limits of the respective agents and were maintained in a file separate from particular bond files. Id. The file was updated yearly. Id. Ms. Johnson stated that the SBA business development specialists would refer to the general file to ascertain the dollar amount of authority a surety agent possessed. Id. If the agent sought to enter into a bond beyond the power of attorney limits, the SBA would require a new power of attorney. Id. In addition, on September 13, 2002, DiGiovanni and Steve Ho, the owner of the project, executed a construction contract for the project in the amount of $1,781,850. Compl. ¶ 11; see also Compl., Ex. 3. Also on September 13, 2002, Mr. Zwart sent a letter to the SBA's office in Atlanta apologizing for not presenting to the SBA the proper paperwork to process the surety bond guarantee at the time of his first submission. App. 5 (in a typographical error, the letter reflected the date September 13, 2001). Attached to the letter was the Application Submission Checklist, the Application for Surety Bond Guarantee Assistance (Form 994), and the Surety Bond Guarantee Agreement form (SBA Form 990) ("Guarantee Agreement") completed by DiGiovanni, amongst other documents. See id. at 6.

On September 26, 2002, the SBA received the Guarantee Agreement for the DiGiovanni bonds. Id. at 10. On September 27, 2002, Frank E. Hagan of the SBA approved the SBA's guarantee of the bonds. Id. Block 1 of the Guarantee Agreement included the following language: "[b]y its authorized signature in block 16 on the date stated in block 18, SBA agrees to guarantee the bond(s) described herein as of the time of issuance, as defined in 13 CFR 115.4, subject to the regulations in 13 CFR 115. SBA guarantees 80% (not to exceed 80%) of the loss . . . ." Id. The Guarantee Agreement described the bonds to which it related as $1,781,850 payment and performance bonds, #160555, with ACIC as the surety and Mr. Ho as the obligee. Id. The Guarantee Agreement was executed on behalf of ACIC by its attorney-in-fact, Mr. Zwart, on September 12, 2002, when he signed the form in block 14.[3] Id. Mr. Aguilar explained that if an agent signed block 14, then it would be reasonable to conclude that the agent had a power of attorney establishing his authority to sign as ACIC's attorney-in-fact. Id. at 79.

---

[3] The original Guarantee Agreement was completed utilizing SBA Form 990. See Compl., Ex. 5. As such, the Guarantee Agreement at issue in this case is a Prior Approval Agreement, which is defined as "the Surety Bond Guarantee Agreement (SBA Form 990) entered into between a Prior Approval Surety and [the] SBA under which [the] SBA agrees to guarantee a specific bond." 13 C.F.R. § 115.10. As a Prior Approval Surety, plaintiff "must [have] obtain[ed the] SBA's prior approval on each guarantee and . . . ha[ve] entered into one or more Prior Approval Agreements with [the] SBA." Id.

Ms. Johnson also confirmed that the SBA would not approve a guarantee agreement unless there was a power of attorney on file authorizing the agent to sign upon behalf of the surety dated prior to the time or on the same day that the agent sent the file to the SBA. Id. at 99.

On October 4, 2002, ACIC's home office issued Power of Attorney 44-1659 to Mr. Zwart. Id. at 12. The bottom left corner of the form contained the bond number, 160555, which corresponds to the DiGiovanni bonds. Id.; Compl., Ex. 4. The form also had ACIC's numerical listing for the respective field agent responsible for the bonds. App. 12. According to Jeannie Lee,[4] ACIC's chief compliance officer testifying as a Rule 30(b)(6) designee, the number 44 in the power of attorney corresponds to the New Orleans branch office. Id. at 107. Also on October 4, 2002, ACIC executed payment and performance bonds, "#160555," in the amount of $1,781,850 in connection with the project. Compl. ¶ 11; see also Compl., Ex. 4 (containing both the payment and performance bonds). The bonds were covered by the SBA's Guarantee Agreement with ACIC. Mot. 3. Concurrent with the issuance of the bonds, on October 4, 2002, Mr. Zwart, as attorney-in-fact for ACIC, executed a Multiple Obligee Rider, acknowledging Omni Bank as an additional obligee on the bonds. App. 13.

In 2003-2004, ACIC, in accordance with its corporate policy, provided Mr. Zwart with copies of powers of attorney that had preexecuted signatures from ACIC's President and Corporate Secretary, as well as a notary. Id. at 85-88. This was ACIC's standard practice regarding powers of attorney at that time. Id. at 110-14. In 2003-2004, ACIC had "no formal procedures" regarding when an agent or branch manager such as Mr. Zwart could ask for such preexecuted powers of attorney. Id. at 120. Upon receipt of these powers of attorney containing preexecuted signatures, branch managers such as Mr. Zwart would enter their own name, the amount that the power of attorney was for, and a date corresponding to the corporate secretary's signature. Id. at 114, 117-19. ACIC did not track when powers of attorney had been executed or used. Id. at 71-74.

### B. The Increase in the Contract Amount and the Bond Amounts

While it is unclear when contract performance began,[5] on March 24, 2003, because of various cost and time issues, Mr. Ho, Mr. DiGiovanni, and the project's architect entered into Change Order Number 2 ("change order") increasing the contract price by $240,000 and increasing the duration of the contract by sixty days. Id. at 17. On that same day, Mr. Zwart sent a letter to DiGiovanni, in which he stated: "As per our conversation of last week, you are approved for the change order of $284,934. After receiving a signed change order from the owner of project [sic]. If you care to discuss please call me at . . . ." Id. at 20. Also on that day, Mr. Zwart again sent a letter to DiGiovanni, in which he repeated what he had said in his previous letter except that "$250,000.00" was inserted in place of "$284,934." Id. at 21. Mr.

---

[4] Sometime after her deposition, Jeannie Kim apparently changed her name to Jeannie Lee. Because the parties refer to her as Ms. Lee, the court does the same.

[5] The date that contract performance commenced is not integral to the disposition of this case.

Zwart signed both letters in his capacity as branch manager. Id. at 20-21. Mr. Zwart explained the purpose of the letters "was informing him [DiGiovanni] that, yes, if this project had an approved change order for $250,000 that he could—we could get that done for him." Id. at 91.

Around that same time period, Brian Behlar, the Omni Bank employee tasked with monitoring the loan and contract performance, learned of the change order and that Mr. Ho was funding the extra $240,000 with his own finances. Id. at 23, ¶ 6. Mr. Behlar determined that a $240,000 increase in the bonds was necessary to ensure completion of the project, so he communicated with Messrs. Ho and Zwart to request that the amount of the bonds be increased by $240,000 to match the increased contract price. Id. at 23, ¶¶ 7, 8.

On March 31, 2003, Mr. Zwart, in his capacity as ACIC's attorney-in-fact, executed two different surety riders, both of which stated that ACIC was "consent[ing]" to change or increase the "contract/bond amount." Id. at 37-38. The purpose of a surety rider is to increase the amount of a bond if the obligee requests that the bond amount be increased. Id. at 77-78. Both riders stated: "For valuable consideration, receipt of which is acknowledged, surety hereby gives its consent to change: the contract/bond amount FROM: $1,781,850.00 with approved changed [sic] order of . . . with appropriate change order signed, TO: . . ." Id. at 37, 38. There were only two differences between the riders. The first rider contained a typewritten increase of $284,934 which was crossed out and the figure $240,000 inserted below. Id. at 37. The rider also indicated that the contract/bond amount was increased to $2,066,784. Id. The second rider read the same as the first rider with the exception that only a typewritten figure of $240,000 was on the form with a corresponding contract/bond increase to $2,021,850. Id. at 38. Both forms contained the same "effective date" of March 24, 2003. Id. at 37, 38. ACIC contends, without objection from defendant, that the operative rider is the rider increasing the contract/bond amount by $240,000. [6] See Mot. 22-24. Mr. Zwart did not recall when he signed the riders, but he did recall that it was the SBA that requested the dates on the rider. App. 92-93, 95-96. Other than his recollection, no evidence exists that the SBA required the surety rider to be prepared, much less in the manner it was prepared.

Also on March 31, 2003, Mr. Ho executed a check made payable to ACIC for $6,720 in connection with the bonds to pay for the increase in the premium amount of the bonds. Id. at 39, 49. ACIC, in response to an interrogatory requesting a detailed description of the consideration which was given for the $240,000 as written upon the surety rider, stated that "[a] copy of the check written by and received from Obligee Steve Ho will be produced. Plaintiff shows that said check was received conditionally, subject to SBA approval of the rider, and for purpose of complying with SBA requirements that tender of SBA's fee had to accompany the request for approval." Id. at 43. ACIC has not produced any proof that the check as written was conditioned upon the SBA's approval. Moreover, ACIC clearly received and cashed the check. Id. at 49-50.

Before April 9, 2003, Omni Bank received the surety rider, which reflected that there had been a $240,000 increase in the bonds. Id. at 23; Mot., Ex. 4. Mr. Ho also confirmed that the

---

[6] Thus, references to the "surety rider," unless otherwise specified, are to the version containing the typed figure of $240,000.

surety rider was delivered to Omni Bank before April 9, 2003. App. 44. ACIC disputes that Omni Bank received the surety rider from ACIC. Mot. 8. It appears, however, that a copy of the surety rider was found in Omni Bank's records. See Mot., Ex. 4 at 20-21; id., Ex. 8 at 30, 78-79. As explained below, the dispute over whether Omni Bank did in fact receive the surety rider during this time frame is not material. On April 9, 2003, Mr. Behlar approved the first draw upon the loan proceeds. App. 22. He stated that he would not have allowed the draw unless he had proof that the amount of the bonds had been increased. Id. at 23.

### C. SBA Approval on June 2, 2004

According to the amended Guarantee Agreement, the SBA received the increase request on May 19, 2004. Id. at 47. Mr. Zwart had signed the form as ACIC's attorney-in-fact on March 14, 2004. Id. The SBA approved the increase on June 2, 2004. Id. In accordance with applicable regulations, the SBA reduced its reimbursement obligation to 79.14% of any loss suffered by ACIC on the bonds. Id. There is no other written record of communications between ACIC and the SBA regarding the increase between March 31, 2003, and May 19, 2004, and there are no documents from ACIC acknowledging that ACIC could not approve the bond increase absent the SBA's prior written approval or without a valid power of attorney. The record also does not contain written evidence from ACIC's home office authorizing Mr. Zwart to sign the surety rider or the amended Guarantee Agreement. However, Mr. Zwart signed both documents as ACIC's attorney-in-fact before the SBA's written approval on June 2, 2004.

While there are no documents reflecting discussions regarding the bond increase between ACIC and the SBA during this time, there are several documents that reflect ACIC's internal efforts to process the increase in the amount of the bonds. On May 9, 2003, an employee in ACIC's New Orleans branch office sent a fax to Mr. Aguilar, forwarding: 1) the Premium Adjustment Notice, 2) the change order, 3) the surety rider, and 4) a copy of the check written by Mr. Ho, with the originals to follow. Id. at 48. On that day, someone at ACIC had prepared a Premium Adjustment Notice, reflecting that the bond amount had increased to $2,066,784 on March 24, 2003. Id. at 49. "A Premium Adjustment Notice is an adjustment in premium on a particular bond. This particular case was an additional premium charge." Id. at 94. The notice also acknowledged receipt of a check in the amount of $6,720 for payment of the increase in the premium. Id. at 49. Apparently, the amount of the check exceeded the cost of the premium increase because someone had used the wrong commission rate. Id. Therefore, on May 14, 2003, ACIC issued another Premium Adjustment Notice. Id. at 50. On this notice, someone had crossed out the $2,066,784 figure and written $2,021,850, but the date of the increase remained the same—March 24, 2003. Id. On April 14, 2004, ACIC prepared another Premium Adjustment Notice also reflecting the bond amount increase to $2,021,850 as shown on the May 14, 2003 Premium Adjustment Notice. Id. at 51. This notice, however, indicated that the date of the change was April 14, 2004. Id.

As mentioned earlier, the SBA received the amended Guarantee Agreement on May 19, 2004. Id. at 47. According to Frank Lanak, ACIC's Senior Vice President of Claims, ACIC's home office file contains the original power of attorney, "N0 8400657," authorizing Mr. Zwart to act as ACIC's attorney-in-fact on May 25, 2004. See Mot., Ex. 1, ¶ 9. Unlike the October 4, 2002 power of attorney, the May 25, 2004 power of attorney does not contain the bond number

or any numbers identifying the responsible field agent. Resp., Ex. 3 at Ex. B. When asked at her deposition about the May 25, 2004 power of attorney, Ms. Lee could not identify which bond the May 25, 2004 power of attorney covered. App. 119. Likewise, Mr. Lanak did not know why the March 23, 2003 surety rider and the May 25, 2004 power of attorney would be linked, stating: "Okay. I don't know. I don't know. I was not involved in the underwriting of this bond." Id. at 101. Yet Mr. Lanak stated in his deposition that the "original rider or the original power was never delivered to either obligee. And if it was never delivered, it was not effective." Id. at 102. This statement conflicts with ACIC's assertion that "Mr. Zwart delivered the original Surety Rider to one or both of the Obligees, on or after receiving approval from the SBA for the increased limit." Id. at 42-43.

### D.  Events After SBA's June 2, 2004 Approval

On June 30, 2004, Mr. DiGiovanni sent a letter to the project's architect, outlining the history of the contract and contending that from the beginning of the contract, there were numerous delays and problems that affected the cost of completion and the time of performance. Id. at 52. In or about July 2004, ACIC received notice of claims on the bonds. Compl. ¶ 13. ACIC investigated and resolved claims on the payment bond via settlement and payments totaling $204,650.67. Id. DiGiovanni was subsequently declared in default by the project owner and was terminated from performing the contract. Id. ¶ 14. ACIC also investigated a claim on the performance bond, which it ultimately resolved via settlement and payments totaling $650,000. Id. ACIC incurred over $100,000 in expenses and attorneys' fees in connection with investigating and defending the claims on the bonds, id. ¶ 16, and recovered $200,000 from the Louisiana Bond Assistance Program, id. ¶ 17, in order to partially offset the losses and expenses incurred in connection with the bonds. See id.

During the pendency of the demand action, ACIC, as required, informed the SBA of the demands made under the bonds. Id. ¶ 18. ACIC submitted, pursuant to 13 C.F.R. § 115.35(c), "numerous requests for payment by the SBA of $619,548.51, with supporting documentation."[7] Id. ¶ 19. Frank J. Lalumiere, the director of SBA's loan guarantee office, became involved, and on December 8, 2006, Mr. Lanak wrote to Mr. Lalumiere responding to several questions      Mr. Lalumiere raised regarding the DiGiovanni claim. App. 55. Mr. Lanak wrote that there was no reinsurance upon the bonds. Id. at 57. Regarding Mr. Zwart's participation, he wrote: "He submitted information to the SBA and to our home office for approval. He was involved in obtaining the approval of the amendment to the guarantee agreement when the principal and obligee sought a contract and bond adjustment." Id. at 56. On December 22, 2006, Mr. Lanak again wrote to Mr. Lalumiere regarding ACIC's position on the demand made upon the SBA, explaining that ACIC's file "reflects that March 24, 2003 was not the effective date of the rider" and that "the rider could not have been delivered any time prior to May 25, 2004, because the power of attorney to execute the rider is not dated until that point and time." Id. at 59.

The SBA continued its investigation, which included referring the matter to the SBA's Inspector General's office. Id. at 64. On May 4, 2007, Mr. Lalumiere informed ACIC's parent

---

[7] ACIC did not attach copies of these submissions as exhibits to its complaint.

company, HCC Surety Group, that after completing its investigation, the "SBA has concluded that ACIC acquiesced in the bond amount of $240,000.00 prior to obtaining the approval of SBA as required by 13 CFR § 115.19(e)." Id. Thus, the SBA stated that it could not honor the claim or any other claim arising out of the DiGiovanni default. Compl. ¶ 19.

## II. PROCEDURAL BACKGROUND

On July 2007, ACIC filed a complaint in this court, in which it alleged that the SBA breached its agreement with ACIC when the SBA refused to reimburse ACIC for payments it made on the bonds. ACIC seeks $535,756.16 for partial reimbursement for payments made by ACIC to satisfy claims against the bonds; $83,792.35 for partial reimbursement of fees or court costs incurred and other costs related to the investigation and defense of litigation of the claims made on the bonds; recovery of prejudgment interest; and recovery of postjudgment interest. Compl., Prayer for Relief. ACIC states that its total loss has grown to over $1 million. Mot. 9. Defendant moved to dismiss, arguing that ACIC failed to state a claim upon which relief could be granted under Rule 12(b)(6) of the United States Court of Federal Claims ("RCFC") on the grounds that ACIC did not obtain prior written approval from the SBA for an increase in the guarantee amount between ACIC and the SBA, as the applicable regulation required. The court granted defendant's motion to dismiss, finding that ACIC had not alleged facts suggesting that it sought and obtained written approval from the SBA to alter the bond amount before acquiescing to the $240,000 increase that became effective March 24, 2003.

ACIC appealed to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), which reversed this court's ruling and remanded for further proceedings. Am. Contractors Indem. Co. v. United States, 570 F.3d 1373 (Fed. Cir. 2009). On appeal, the government argued that 13 C.F.R. § 115.19(e) bars liability because the surety rider's effective date, March, 24, 2003, predates the date when the SBA approved the amended Guarantee Agreement, June 2, 2004. Id. at 1376. The Federal Circuit held that the government's argument was premised on the incorrect notion that § 115.19(e) must be interpreted as providing that the effective date of a bond is necessarily the date when the parties to the bond "agree[d] to or acquiesce[d] in" a change. Id. The Federal Circuit held that under the plain language of the regulation, the relevant date is the date the surety "'agrees to or acquiesces in'" a material change to a bond, not the effective date of that change. Id. (quoting 13 C.F.R. § 115.19(e)). It explained that while the effective date of a rider altering a bond may be the same as the agreement or acquiescence date, it is not necessarily the same as the agreement or acquiescence date in every case. Id. The Federal Circuit noted that it is industry practice to date surety bonds to conform to the date of the bonded obligation, such that an agreement reached on a given date may result in retroactive issuance of a bond with a much earlier "effective date." Id. at 1377. According to the Federal Circuit, the mere existence of an earlier effective date does not establish a violation of § 115.19(e). Id.

Thus, the Federal Circuit found that this court erred in dismissing ACIC's complaint for failure to state a claim because the "'effective'" date of the bond is not necessarily the date of agreement or acquiescence within the meaning of § 115.19(e). Id. Nevertheless, it did note: "It may be that, on a motion for summary judgment, filed after appropriate discovery, the government will be able to establish that ACIC agreed to alter the DiGiovanni bond before

8

receiving SBA approval. However, no motion for summary judgment was before the Court of Federal Claims, and we express no opinion on whether such a motion would be successful." Id. The Federal Circuit held that the question for this court "is whether the SBA's obligation is voided because the plaintiff surety, ACIC, agreed to an amendment of the underlying bond, and the amendment has an effective date before the date of the SBA's approval of the amendment." Id. at 1374. The Federal Circuit also noted that ACIC argued that the relevant date for purposes of § 115.19(e), or the date of agreement or acquiescence, is the date that the bond first becomes enforceable and that the bond does not become enforceable until delivery and acceptance. Id. The Federal Circuit, however, did not express an opinion on this argument, stating that it would be "best addressed by the Court of Federal Claims in the first instance." Id.

On remand, defendant filed an answer, and the parties engaged in discovery, after which cross-motions for summary judgment were filed. Oral argument on the cross-motions was held, and after argument, plaintiff filed a motion requesting that the court allow and consider additional record excerpts in proceedings on summary judgment, which the government opposed. With its motion, plaintiff attached additional excerpts from two depositions. Plaintiff proffered these excerpts to support its contentions regarding Omni Bank's policies and Mr. Behlar's understanding of those policies. The court grants the motion, but, as explained further below, the bank's policies and Mr. Behlar's understanding of those policies are irrelevant to whether ACIC created the surety rider that increased the bond amount before receiving SBA approval.

## III.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

The Tucker Act, 28 U.S.C. § 1491 (2000), confers upon the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Id. § 1491(a)(1). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, the statute "itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing United States v. Mitchell, 463 U.S. 206, 216 (1983)). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). In this case, plaintiff asserts jurisdiction on the basis of the Guarantee Agreement with the SBA, which is authorized to enter into agreements with sureties pursuant to 15 U.S.C. § 694b. Compl. ¶ 3. Because ACIC's claim rests upon an express contract with the United States, the court has jurisdiction in this case.

9

## B. Motion for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250. The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. , 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. . at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact ...."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## IV. DISCUSSION

The plain language of the relevant SBA regulation states that the SBA is not liable if a prior approval surety agrees to or acquiesces in a material alteration to the bond amount without first obtaining written SBA approval. Such is the situation here; ACIC agreed to increase the bond amount before SBA approval. To shield itself from the consequences that flow from its failure to comply with the SBA regulation, ACIC asks the court to read requirements into the pertinent regulation regarding enforceability. For instance, ACIC argues that the original surety rider was never delivered to either obligee, and as a result, it was not effective until after SBA approval. In a similar vein, ACIC claims that because the original power of attorney remains in its files, ACIC could not have agreed to a material alteration to the bond amount before SBA approval. As discussed below, the court does not find ACIC's arguments persuasive.

10

**A.  Under 13 C.F.R. § 115.19(e), the SBA Is Not Liable if the Surety Agrees to or Acquiesces in a Material Alteration to a Bond Without Obtaining Prior Written Approval From the SBA**

Pursuant to 15 U.S.C. § 694b(a), the SBA can enter into bond guarantee agreements with sureties "against loss resulting from a breach of the terms of a bid bond, payment bond, performance bond, or bonds ancillary thereto, by a principal on any total work order or contract amount at the time of bond execution that does not exceed $2,000,000."[8]  Section 694b(e) further states that the SBA "shall reimburse the surety," except that the SBA shall be relieved of all liability if, for instance, "the total contract amount at the time of execution of the bond or bonds exceeds $2,000,000," or "the surety has breached a material term or condition of such guarantee agreement."  15 U.S.C. § 694b(e)(2)-(3) (2000).

Here, the SBA "agree[d] to guarantee the bond(s) described" in the Guarantee Agreement "as of the time of the issuance . . . subject to the regulations in 13 C.F.R. § 115."  App. 10.  Section 115.19 of Title 13 of the Code of Federal Regulations, "Denial of Liability," announces the circumstances under which the SBA may deny liability under a loan guarantee agreement.  Section 115.19 states that the SBA is relieved of liability if:

> (e) *Alteration.* Without obtaining prior written approval from SBA (which may be conditioned upon payment of additional fees), the Surety agrees to or acquiesces in any material alteration in the terms, conditions, or provisions of the bond, including but not limited to the following acts:
>
> (1) Naming as an Obligee or co-Obligee any Person that does not qualify as an Obligee under §115.10; or
>
> (2) In the case of a Prior Approval Surety, acquiescing in any alteration to the bond which would increase the bond amount by at least 25% or $50,000.

13 C.F.R. § 115.19(e).

As stated above, ACIC was a prior approval surety and the increase in the bond amount ($240,000) is greater than the $50,000 minimum stated in the regulation.  Thus, there is no dispute that 13 C.F.R. § 115.19(e) applies.  The question, rather, is whether ACIC agreed or acquiesced to this alteration before it received written approval from the SBA on June 2, 2004.

---

[8]  The $2 million limit has since been increased.  15 U.S.C. § 694b (2006 & Supp. III 2010).  However, for this decision, the court relies on the version of the statute in effect in June 2004.

**B. ACIC Agreed to a Material Alteration of the Bonds Before the SBA Provided Written Approval**

The record before the court reflects that ACIC agreed to a material alteration of the bonds before the SBA provided written approval on June 2, 2004. Based on the plain language of the regulation, 13 C.F.R. § 115.19(e), if the surety agrees or acquiesces to an increase without prior approval, then the SBA is relieved of liability. See Am. Contractors, 570 F.3d at 1376.

The relevant SBA regulation, 13 C.F.R. § 115.19(e), does not define or describe what constitutes agreement or acquiescence, nor is there case law that defines these terms in the context of this regulation. The Restatement (Second) of Contracts defines agreement as "a manifestation of mutual assent on the part of two or more persons." Restatement (Second) of Contracts § 3 (2012). "Manifestation of mutual assent" to an exchange "requires that each party either make a promise or begin or render a performance." Id. § 18. Black's Law Dictionary defines agreement as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." Black's Law Dictionary (9th ed. 2009)

When Mr. Behlar, an employee of Omni Bank, learned about the increase to the contract amount, he requested an increase to the bond amount. Even if Mr. Behlar was mistaken that a surety rider was needed because Mr. Ho was paying for the increase with his own funds, rather than requesting that the bank finance that amount, as ACIC argues, the record establishes that Omni Bank nonetheless requested a rider. ACIC collected a fee from Mr. Ho of $6,720 to cover the increase in the premium, and Mr. Zwart executed the surety rider on March 31, 2003, which states in pertinent part that "[f]or valuable consideration, receipt of which is acknowledged," the "surety hereby gives its consent to change[] the contract/bond amount" in light of the approved change order of $240,000. App. 38. Clearly, by function of that payment and execution of that document, Mr. Ho, Omni Bank, and ACIC agreed to an increase in the amount of the bonds. The surety rider, which was executed in exchange for the fee, serves as an unambiguous expression of an agreement by ACIC to an increase in the bond amount. Therefore, ACIC agreed or acquiesced to an increase at the time Mr. Zwart acknowledged receipt of valuable consideration (the $6,720 check from Mr. Ho) in exchange for increasing the amount of the bonds (by $240,000)—all of which occurred in or around March 2003, well before the SBA's written approval on June 2, 2004.

**C. ACIC's Arguments Regarding Enforceability Are Not Persuasive**

ACIC makes various arguments to escape the plain language of the regulation. One, it asserts that the court should first consider what effect a change to a construction contract has on a surety bond and conclude that a change to the construction contract does not automatically change the amount of the bond. The court agrees that an increase to the contract amount did not automatically result in an increase to the bond amount. However, this inquiry is irrelevant to the question before the court. The issue before the court, rather, is when ACIC agreed to or acquiesced in a material alteration to the bond amount.

Next, ACIC asserts that it could only have agreed to or acquiesced in a material alteration to the bond if a current, sufficient power of attorney establishing Mr. Zwart's authority to issue an enforceable bond in the amount sought was presented simultaneously with the original surety rider. Specifically, it argues that it could not have agreed to the material alteration before SBA approval because 1) no valid power of attorney existed until May 25, 2004, and 2) no original surety rider was delivered to any of the obligees before SBA approval. ACIC claims that enforceability is the measure for agreement or acquiescence because any other interpretation of the regulation would mean that "where the surety creates the paperwork that would document a change in the bond amount in order to satisfy SBA requirements that such paperwork be submitted prior to the SBA issuing its approval, an argument could be made that the surety had 'agreed' to the change in the bond before the SBA approved it!" Resp. 12. However, the mere fact that ACIC began paperwork attendant to effecting a bond amount increase does not establish that it agreed to or acquiesced in the material alteration; rather, it is ACIC's additional actions that reflect that it agreed to the material alteration before the SBA provided written approval, as discussed above.

### 1. ACIC Asserts That the Power of Attorney Was Not Issued Until May 25, 2004

ACIC argues that in order for a bond to be enforceable, such that the SBA's guarantee would attach, a current power of attorney with a sufficient limit had to be presented to show that the person signing the bond had the authority to do so. Here, however, ACIC asserts that Mr. Zwart had no written authority to issue the surety rider before May 25, 2004, and as a result, ACIC could not have agreed or acquiesced before this date.

There are several flaws with ACIC's argument. First, the SBA regulation, 13 C.F.R. § 115.19(e), allows the SBA to disclaim liability as soon as ACIC agrees or acquiesces to a material increase if the SBA has not provided prior written approval. It does not require the SBA to first ascertain whether Mr. Zwart had the authority to bind ACIC. Moreover, when Mr. Zwart possessed a valid power of attorney does not address the issue of when ACIC agreed or acquiesced to the increase in the bond amount. Finally, even if ACIC's assertion that a valid power of attorney had to exist before ACIC could be deemed to have agreed or acquiesced to the increase, Mr. Zwart's power of attorney was valid beginning on May 25, 2004, days before the SBA provided written approval. Thus, even under ACIC's theory, ACIC cannot demonstrate that it did not agree or acquiesce before SBA's June 2, 2004 approval.

Additionally, even if ACIC's argument that it could not have acquiesced or agreed to the increase until Mr. Zwart possessed a valid power of attorney for the full amount of the bond (May 25, 2004), ACIC has not clearly established that this power of attorney is conclusively linked to the rider for the bonds. At his deposition in March 2011, Mr. Zwart could not remember much about the surety rider, such as when he signed it, could not remember if he saw the check from Mr. Ho for the premium, and could not remember the SBA procedures for obtaining approval regarding an increase to the bonds. App. 92-95. But in his affidavit almost a year later in April 2012, Mr. Zwart recalled the SBA procedures that he followed in order to obtain SBA approval for the increase to the bond amount and stated that at all times, he coordinated with and followed the directions of the ACIC home office and the SBA as to how to

13

proceed.[9] Resp., Ex. 2, ¶¶ 8-14. Mr. Zwart also stated in his affidavit that he did not "prior to obtaining the approval of the SBA to the increase, deliver the original 'Rider' to anyone or otherwise communicate to anyone that the 'Rider' had been issued, nor did [he] affix a power-of-attorney form to the 'Rider' prior to SBA approval . . . ." Id. ¶ 10. Mr. Zwart further stated that the SBA reminded him that they needed a written power of attorney showing that he had the authority to issue bonds for which an SBA guarantee was to be provided and that there was not a power of attorney on file with the SBA showing that he had sufficient authority to issue a bond in the amount that the DiGiovanni bonds would be after they were increased. Id. ¶ 12. Notably, Mr. Zwart stated that while he had both telephonic and written (in electronic mail and letter format) communications with the SBA between March 2003 and May 2004, the record does not contain any such communications, much less communications from the SBA directing Mr. Zwart to take certain actions in order to get SBA approval for the increase.

In his deposition on April 7, 2011, Mr. Lanak stated that he did not know why there was a March 24, 2003 surety rider that was apparently attached to a May 25, 2004 power of attorney or why those two documents should be linked together. App. 101. Mr. Lanak, however, stated in a January 20, 2012 affidavit that the May 25, 2004 Zwart power of attorney was "prepared for the issuance of the rider on the DiGiovanni bond." Mot., Ex. 1, ¶ 8. He also stated that the original power of attorney was contained in the file, so it was never delivered to or provided to either obligee (Mr. Ho or Omni Bank). Id. ¶ 9.

Defendant asserts that the sham affidavit rule applies here. The court agrees. Under this rule, an affidavit may be disregarded as a sham "'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986) (quoting T. Junkins & Assocs. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984)). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2nd Cir. 1969); see also Abbey v. United States, 99 Fed. Cl. 430, 457 (2011) ("Under the sham affidavit doctrine, a party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity." (citations and internal quotations omitted)). As such, Mr. Lanak's statement in his affidavit, which directly contradicts his previously given clear answer to an unambiguous question, is stricken under the sham affidavit doctrine.

_____

[9] In asserting that he only acted at the direction of the SBA, Mr. Zwart stated that the SBA requested that he prepare the surety rider. Resp., Ex. 2, ¶ 10. However, this assertion does not seem logical. Mr. Behlar stated that Omni Bank requested the increase to the bond amount, and it seems logical that the bank would request documentation of such an increase (the rider form) because the bank is one of the obligees. App. 23, ¶ 8. Moreover, as defendant notes, the record contains no communications between the SBA and Mr. Zwart reflecting that the SBA directed Mr. Zwart to prepare the rider.

Moreover, Mr. Zwart held himself out as ACIC's attorney-in-fact throughout the time that the bonds at issue were active, and as a result, Mr. Behlar reasonably relied upon Mr. Zwart's authority, either actual or apparent. Apparent authority is the "power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006). Apparent authority "is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Id. § 3.303. Here, Mr. Zwart signed the surety rider sometime in March 2003, acting as ACIC's attorney-in-fact; thus, Mr. Behlar reasonably relied upon Mr. Zwart's apparent authority.

## 2. ACIC Asserts That the Surety Rider Was Not Necessary and Was Not Delivered

In support of its argument that the court must look to the enforceability of the bond increase in determining when ACIC agreed to that increase, ACIC makes two arguments regarding the surety rider. One, ACIC claims that the bank did not need the surety rider because Mr. Ho was financing the $240,000 increase from his own finances, rather than requesting that the bank finance the increase. Next, ACIC asserts that because the original surety rider was not delivered to anyone before SBA approval, ACIC could not have agreed to the increase in the bond amount.

First, ACIC argues that Mr. Behlar mistakenly believed that Omni Bank required the surety rider. Mr. Behlar states that he communicated with Messrs. Ho and Zwart and required that the bond amount be increased and requested documentation of that increase. App. 23, ¶ 8. He states that before the April 9, 2003 draw on the loan, Omni Bank received the surety rider. Id. at 23, ¶ 9. ACIC disputes this testimony. Specifically, it argues that even if Mr. Behlar's affidavit is taken as true and accurate and that the surety rider became enforceable upon receipt by Mr. Behlar, ACIC nonetheless prevails because 1) Omni Bank did not require a rider since Mr. Ho was paying for the increase using his own finances; and 2) Mr. Zwart did not have the power of attorney to bind ACIC at the time that Mr. Behlar purportedly received the surety rider. However, regardless of whether Mr. Behlar was mistaken about the bank's position, Mr. Behlar did disburse payment upon receiving the surety rider. Id. Moreover, as explained above, the fact that Mr. Zwart may not have had a valid power of attorney was irrelevant from the bank's perspective since Mr. Zwart acted in response to Mr. Behlar's request for the rider.

ACIC further argues that even if Mr. Behlar's affidavit is taken as true and accurate, it still prevails because while Mr. Zwart prepared the surety rider to effectuate the increase, he did not deliver the rider to anyone or tell anyone that the rider had been issued, nor did he affix the power of attorney to the rider because he knew that the rider could not be issued before SBA approval. ACIC attempts to distance itself from its employee's actions, arguing that any act that Mr. Zwart may have taken earlier than May 25, 2004, to change the obligation of ACIC by issuing the rider was ineffective and could not constitute acquiescence or agreement on behalf of ACIC to be bound by the rider. Thus, ACIC asserts that even if Mr. Zwart delivered the rider to Omni Bank in March 2003 changing the amount to $2,021,850, he had no valid power of attorney to execute the rider and thereby bind ACIC. However, the record establishes that Omni

15

Bank had a copy of the surety rider, and according to Mr. Behlar, ACIC delivered the rider to Omni Bank. Mr. Ho also confirms that the surety rider was delivered to Omni Bank before April 9, 2003.

Nonetheless, even if the rider was not delivered, this is not material because Omni Bank acted on the agreement it had reached with ACIC by releasing a payment based upon that increase in the bond amount. Mr. Behlar states that before April 9, 2003, Omni Bank received the surety rider, which reflected that there had been a $240,000 increase in the bond amount. App. 23; Mot., Ex. 4. On April 9, 2003, Mr. Behlar approved the first draw upon the loan proceeds. App. 22. He stated that he would not have allowed the draw unless he had proof that the amount of the bonds had been increased. Id. at 23.

In sum, the relevant SBA regulation clearly states that the SBA is not liable if a prior approval surety agrees to or acquiesces in a material alteration to the bond amount without first obtaining written SBA approval, and here, ACIC agreed to increase the bond amount before SBA approval.

## V. CONCLUSION

For the reasons explained above:

1. The court **GRANTS** plaintiff's motion to allow and consider additional record excerpts in the proceedings on summary judgment.

2. The court **DENIES** plaintiff's motion for summary judgment and **GRANTS** defendant's cross-motion for summary judgment.

Plaintiff's complaint is **DISMISSED**. No costs. The clerk is directed to enter judgment in accordance with this decision.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

16